# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **ANOVORX HOLDINGS, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. _____ |
| | ) |
| **AGILETHOUGHT, INC.** | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT FOR BREACH OF CONTRACT

AnovoRx Holdings, Inc. ("Anovo"), by and through its undersigned counsel, and in support of this Complaint, states as follows:

## GENERAL ALLEGATIONS

1. Anovo is a duly organized Tennessee corporation with its principal place in 1710 Shelby Oaks Dr. N, Suite 2, Memphis, Tennessee 38134. For purposes of determining diversity of citizenship, Anovo is a citizen of the State of Tennessee and not of any other state.

2. Defendant AgileThought, Inc. ("AgileThought") is a Delaware corporation with its principal place of business at 222 West Las Colinas Blvd., Suite 1650E, Irving, Texas 75039. For purposes of determining diversity of citizenship, AgileThought is a citizen of the State of Delaware, the State of Texas, and not of any other state.

3. Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction over this action because the parties are citizens of different states and the amount in controversy is more than $75,000, exclusive of interest and costs.

4. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

5. Anovo is a specialty pharmacy business that desired to acquire customized software.

6. 4th Source, LLC ("4th Source") was a Delaware corporation with its principal place of business in Tampa, Florida. 4th Source, LLC was acquired by AN Global, Inc. ("AN Global"). Subsequent to AN Global's acquisition of AgileThought, Inc., the combined business has operated as, and under the name, AgileThought.

7. In 2019, 4th Source was engaged by Anovo to provide information technology software development services.

8. In May 2019, Anovo entered into agreements with 4th Source to design and build a custom software solution (the "Software Product") for Anovo.

9. Anovo and 4th Source executed a Master Services Agreement ("MSA"). The effective date of the MSA was May 28, 2019. A copy of the MSA is attached as Exhibit A.

10. Pursuant to the MSA, the parties' performance obligations were to be more specifically stated in Statements of Work ("SOWs"). Pursuant to the MSA, each SOW together with the terms of the MSA constitutes a separate contract.

11. Anovo and 4th Source executed Statement of Work #1 ("SOW #1") on or about July 24, 2019. A copy of SOW #1 is attached as Exhibit B.

12. Anovo and AgileThought executed Statement of Work #2 ("SOW #2) on or about June 29, 2021. A copy of SOW #2 is attached as Exhibit C.

13. AgileThought executed Statement of Work #3 ("SOW #3) on September 3, 2021. Anovo executed SOW #3 on or about September 8, 2021. A copy of SOW #3 is attached as Exhibit D. The MSA, SOW #1, SOW #2, and SOW #3 will be collectively referred to as "the Agreements."

14. Pursuant to the MSA, each SOW is required to set forth a "Services Schedule" including the planned start date, the projected end date, and other relevant dates if any.

15. Pursuant to the MSA, each SOW is required to set forth the "identifiable work product resulting from the services" or "Deliverables."

16. Pursuant to the MSA, each SOW is required to set forth the "Fees."

17. Under the MSA, the Fees for each SOW could be set by a "fixed price" or "time & materials rate."

18. Pursuant to SOW #1, 4th Source agreed to design and develop the Software Product for Anovo. In exchange, Anovo agreed to pay a fixed fee of $1,600,000.00 to 4th Source.

19. SOW #1 set forth a number of Deliverables for the Software Product. *See* Exhibit B § D. These Deliverables included:

- A Security Module to allow users to login to the application;
- Master tables to store common data shared across the application;
- An inventory module to handle all inventory functions including drug inventory purchase information
- An Intake system to capture and maintain information for new and existing patients;
- An order entry system with functionality to enter order information and associate orders with prescriptions.
- Functionality to capture all relevant prescription information.
- Notifications system to manage and automatically send different types of notifications.
- Functionality to run drug utilization reviews.
- Process to manage claims adjudications.
- An assessment configuration tool.
- A tracking system to collect and maintain prior authorizations.
- Tools and services to process payments, generate and track invoices.
- A labeling module to prepare prescription labels, work orders, patient monographs, and delivery tickets.
- A benefits verification system with tools and services to enter, maintain, and track patient benefit information.

- A report manager with the ability to create predefined reports and export data;
- Indexing Service to receive prescription files from different sources and assign those prescriptions to the corresponding work queues;
- A task manager module with tools to handle task assignment and status;
- A shipping manager module with tools to handle the shipping information and scheduling with carriers;
- An external application program interface module capable of interacting with external services;
- A plan and tools to migrate data from Anovo's existing system to the new system;
- A case management module with functionality to create new cases and manage the flow of case-related information;
- Letter management tools to manage and configure for production standardized letters.
- A module to bridge the cases based on Anovo's business rules.
- Functionality to triage referrals.
- A patient assistance program to store and manage patient information; and
- A process to handle drug pricing information.

20. The parties agreed 4th Source was to begin work on or around August 5, 2019.

21. The parties agreed 4th Source would complete its work on approximately September 30, 2020.

22. 4th Source, however, did not deliver the contractually agreed upon Software Product by September of 2020.

23. Instead, 4th Source advised Anovo that additional time was needed to deliver the contractually agreed-upon Software Product.

24. Between August 2019 and March 31, 2021, Anovo made payments totaling $1,539,802 to 4th Source and/or AgileThought pursuant to the fees and work effort set forth in SOW #1.

25. Between August 2019 and March 31, 2021, Anovo met its contractual obligations under the MSA and SOW #1.

26. 4th Source, however, still did not deliver the contractually agreed upon Software Product by March 31, 2021.

27. Indeed, AgileThought communicated to Anovo it could not complete the work set forth in SOW #1 for the fixed price established in SOW #1. AgileThought further communicated to Anovo the 4th Source executives had underestimated the amount of work to be done, as well as the necessary fees to complete the Software Product.

28. AgileThought proposed a "re-set" of the fixed amount agreement set forth in SOW #1.

29. During the week of May 17, 2021, representatives from both AgileThought and Anovo conducted an onsite workshop at the Anovo facilities in Memphis, Tennessee (the "May 2021 Workshop").

30. The purpose of the May 2021 Workshop was to develop a shared understanding of the deliverables necessary to achieve release of "Version 1" of the Software Product and any additional costs associated with such deliverables.

31. Following the May 2021 Workshop, the parties' representatives negotiated revised pricing.

32. During these negotiations, representatives of AgileThought discussed how 4th Source underestimated the time and resources needed to complete the required work and requested modifications to SOW #1 including, among other things, the fee owed to AgileThought. Although Anovo had no obligation to do so, in a showing of good faith, Anovo agreed to negotiate modified payment terms. Anovo made it clear, however, that such underestimation of requisite work could not happen again.

33. On June 23, 2021, Jon Peters, the Chief Executive Officer ("CEO") of Anovo, spoke by telephone with Manuel Senderos, the CEO of AgileThought.

34. During this June 23, 2021 telephone call, Anovo and AgileThought negotiated terms for restructuring the contractual relationship.

35. On June 23, 2021, AgileThought's Mike Marketos sent an email to Mr. Peters of Anovo. *See* Email Chain (copy attached as Exhibit E).

36. Mr. Marketos's June 23, 2021 email communication stated: "We can confirm that we will complete the remaining work identified during May's workshop for $750,000 as agreed to by Jon and Manuel on the call today."

37. Mr. Marketos's June 23, 2021 email set forth a proposed fees schedule for the Software Product. First, the email stated there would be a "[o]ne time payment of $500,000 made by Anovo to AgileThought by Tuesday, June 29th." *Id.* Second, the email stated there would be "[m]onthly billing of $22,727.27 starting in July through the end of the project scheduled in May 2022." *Id.* Eleven monthly payments of $22,727.27 would amount to a cumulative $249,999.97.

38. On June 29, 2021, AgileThought transmitted two proposed Statements of Work to Anovo.

39. The June 29, 2021 email transmitting the proposed Statements of Work stated:

Please see attached the 2 SOW's that correlate to the work delivered in [April, May, and June] for $500k and the SOW for work to be performed from July through to the end of Release 1 ($250k). In the SOW 3 document we have included all the requirements for the solution that we have discussed both during and subsequent to the Memphis workshop in mid May.

*See* Email Chain, Ex. E.

40. SOW #2 specified the scope of services provided by AgileThought to include "the incremental project deliverables in order to address and understand the scope and work required to deliver Release 1 of the product."

41. SOW #2 pertained to work performed by AgileThought from April to June 2021 and the workshop to review the "requirements needed for Release 1" of the Software product.

42. Pursuant to SOW #2, Anovo was required to make a payment of $500,000 to AgileThought.

43. The June 29, 2021 email transmitting the proposed statements of work also included an invoice for $500,000.

44. Subsequent to receipt of the invoice received June 29, 2022, Anovo made a payment of $500,000 to Agile on June 30, 2022 by wire transfer.

45. Pursuant to SOW #3, Anovo agreed to release any outstanding claims under SOW #1 and to pay $250,000 to AgileThought in exchange for AgileThought's completion of the Software Product.

46. SOW #3 acknowledged that AgileThought was "in the process of building a custom Pharmacy and Hub Processing System for AnovoRx that will manage all aspects of Pharmacy and Hub operations and allow for the retirement of three legacy systems."

47. SOW #3 specified the requirements for the Software Product to be completed.

48. SOW #3 stated: "This proposal encompasses the work required to implement the remaining identified features to achieve Version 1 of the product as discussed during the onsite workshop held during the week of 5/17/2021 and in remote working sessions held prior."

49. A list of these deliverables was attached as Appendix A to SOW #3.

50. Appendix A to SOW #3 sets out one hundred seventy-six (176) features that were to be included in the delivered Software Product.

51. Under SOW #3, any changes to the project's scope were to be documented in a change order signed by both parties.

52. At no point did the parties execute a change order pertaining to the project scope.

53. Under the MSA, Anovo's fees to AgileThought were to be set forth in the SOW. The fees were to be either for a "fixed price" or based on "time & materials rates." SOW #3 included no time or material rates.

54. SOW #3 stated "[t]he estimated investment required from AnovoRx for the Services is: $250,000." Anovo also agreed to reimburse AgileThought for reasonable travel costs insofar as such expenses were consistent with Anovo's guidelines and approved in advance by Anovo.

55. SOW #3 further stated the parties would follow a change control process if any requests or delays would require resources beyond the estimate of $250,000.

56. SOW #3 included a provision setting out a "proposed delivery schedule."

57. The proposed delivery schedule in SOW #3 stated Version 1 was targeted for release around May 2022. The delivery schedule further stated AgileThought's intent "to release working pieces of the overall solutions in a regular cadence" prior to the full release of Version 1.

58. Any changes to the project budget were to be documented in a change order signed by both parties. *See* SOW #3 § 2.2.

59. The parties did not execute a change order pertaining to the budget for SOW #3.

60. SOW #3 was fully executed by the parties by September 8, 2021.

61. Anovo made payments of $45,454.00 to AgileThought for work contracted to be undertaken pursuant to SOW #3, bringing the aggregate amount paid to 4th Source and AgileThought by Anovo to $2,085,256.00 pursuant to SOW #1, SOW #2 and SOW #3.

62. In November 2021, however, AgileThought informed Anovo it would not complete development of the customized software product without additional fees.

63. In November 2021, AgileThought informed Anovo it would cease work on SOW #3 in May 2022 irrespective of completion status.

64. On November 17, 2021, Mr. Peters, sent an email to AgileThought CEO, Manuel Senderos. *See* Email from J. Peters to M. Senderos (Nov. 17, 2021) (*see* Email Chain, Ex. E). In that email, Mr. Peters communicated to Mr. Senderos that AgileThought, through Mr. Marketos, had informed Anovo that AgileThought would quit working on SOW #3 in May 2022 irrespective of completion status. Mr. Peters further communicated to Mr. Senderos that AgileThought's request for additional funding was contrary to the Agreements between the parties. Mr. Peters further communicated to Mr. Senderos there was a need to have a conversation about the Agreements.

65. Subsequent to November 17, 2021, Mr. Senderos initially posited that he would personally address the items raised in Mr. Peter's November 17, 2021 email. Ultimately, however. Mr. Senderos ceased communicating with Anovo directly, advising that AgileThought's Chief Operating Officer, Kevin Johnston, would "step in for me on this."

66. On or around December 14, 2021, a virtual meeting was held that was attended by multiple representatives of Anovo (including Mr. Peters and Anovo's COO, Kyle Truitt), on the one hand, and representatives of AgileThought (including Mr. Johnston), on the other hand. During this meeting, Mr. Johnston sought to pressure Anovo to end the project engagement by questioning Anovo's need for the Software Product. Mr. Johnston further reiterated that AgileThought would cease work on SOW #3 in May 2022 irrespective of completion status.

67. Despite AgileThought's unequivocal statements that it would cease work on SOW #3 in May 2022 irrespective of completion status, Anovo continued to press AgileThought to fulfill AgileThought's obligations under the Agreements.

68. Specifically, in late December/January 2022, Mr. Truitt communicated regularly with one of AgileThought's Managing Directors, Paul Mallabar. It was through these communications that AgileThought revealed that at all relevant times AgileThought intended to use a blended hourly rate of $81.00 when determining the AgileThought project fees and invoicing Anovo for the work needed to complete the Software Product.

69. At no time prior to Anovo and AgileThought entering into SOW #2 or SOW #3, however, did AgileThought ever communicate its intention to deviate from the blended hourly rate of $28.22 utilized to price the fixed-fee arrangement under SOW #1. Anovo learned for the first time that AgileThought intended to use a blended hourly rate of $81.00 on January 9, 2022.

70. Thus, when Anovo entered into SOW #2 and SOW #3 on June 16, and July 1, 2021, respectively, it did so based on AgileThought's material omissions and misrepresentations that the fixed-fee cost increases under SOW #2 and SOW #3 were based on a blended hourly rate of $28.22 and that such fixed-fee amounts were sufficient for AgileThought to complete the Software Product.

71. Once Anovo questioned AgileThought about the significant rate increase used to price the work to complete the Software Product, AgileThought embarked on a campaign of pretext to terminate the Agreements.

72. On April 8, 2022, AgileThought transmitted a demand letter to Kyle Truitt of Anovo. In its April 8, 2022 letter, AgileThought demanded payment in the amount of $158,658.00. The letter demanded payment within fifteen (15) days. *See* Letter from K. Johnston to K. Truitt (Apr. 8, 2022) (copy attached as Exhibit F).

73. On April 20, 2022, Anovo responded, disputing that any further fees were due and providing notice of AgileThought's material breaches. *See* Letter from J. Peters to K. Johnston & C. Cesar (Apr. 20, 2022) (copy attached as Exhibit G).

74. On April 29, 2022, Kevin Johnston, AgileThought's Chief Operations Officer ("COO"), responded to Anovo. *See* Letter from K. Johnston (AgileThought) to J. Peters (Apr. 29, 2022) (copy attached as Exhibit H). In this April 29, 2022 letter, AgileThought terminated the agreement.

75. As of the date of this filing, AgileThought has not delivered the Software Product to Anovo and has ceased working to complete the Software Product.

### COUNT I – BREACH OF MASTER SERVICE AGREEMENT AND STATEMENT OF WORK #3

76. Anovo realleges and incorporates the foregoing paragraphs as if fully set forth herein.

77. As set forth herein, SOW #3 and the MSA constitute an enforceable contract between the parties.

78. AgileThought's nonperformance of SOW #3 and the MSA and failure to deliver the completed Software product is set forth in detail above.

79. The material breaches of AgileThought have directly and proximately caused damages to Anovo.

### COUNT II – ANTICIPATORY BREACH OF MASTER SERVICE AGREEMENT AND STATEMENT OF WORK #3

80. Anovo realleges and incorporates the foregoing paragraphs as if fully set forth herein.

81. As set forth herein, SOW #3 and the MSA constitute an enforceable contract between the parties.

82. AgileThought's nonperformance of SOW #3 and the MSA and failure to deliver the completed Software product is set forth in detail above.

83. Notwithstanding its nonperformance of SOW #3 and the MSA, AgileThought has, through its officers and high-ranking employees, communicated to Anovo clearly and unequivocally that AgileThought refuses to perform any additional work in accordance with SOW #3 and the MSA.

84. Alternatively, AgileThought has conditioned performance of additional work on extra-contractual payments, including without limitation payment of money not included in the agreement between Anovo and AgileThought.

85. AgileThought has thus arbitrarily demanded payment not required by the agreement and has coupled such demand with a refusal to perform unless the demand is met.

86. AgileThought has, therefore, anticipatorily repudiated SOW #3 and the MSA, thereby relieving Anovo of any duty to perform under the agreement, in addition to Anovo's entitlement of damages as a result of such material breaches.

### COUNT III – BREACH OF MASTER SERVICE AGREEMENT AND STATEMENT OF WORK #1

87. Anovo realleges and incorporates the foregoing paragraphs as if fully set forth herein.

88. As set forth herein, SOW #1 and the MSA constitute an enforceable contract between the parties.

89. AgileThought's nonperformance of SOW #1 and the MSA and failure to deliver the completed Software product is set forth in detail above.

90. Any release of Anovo's claims related to SOW #1 is unenforceable due to AgileThought's material breach of SOW #3 and the MSA.

91. The material breaches of AgileThought have directly and proximately caused damages to Anovo.

### COUNT IV – BREACH OF MASTER SERVICE AGREEMENT AND STATEMENT OF WORK #2

92. Anovo realleges and incorporates the foregoing paragraphs as if fully set forth herein.

93. As set forth herein, SOW #2 and the MSA constitute an enforceable contract between the parties.

94. To the extent AgileThought failed to appropriately understand the scope of services and work required to complete the Software Product, AgileThought materially breached SOW #2 and the MSA.

95. The material breaches of AgileThought have directly and proximately caused damages to Anovo.

### COUNT V – FRAUD IN THE INDUCEMENT

96. Anovo realleges and incorporates the foregoing paragraphs as if fully set forth herein.

97. Anovo and 4th Source entered into the MSA and SOW #1 premised on the agreement that 4th Source would deliver the Software Product as a fixed-fee arrangement. The fixed-fee set under SOW #1 utilized a blended rate of $28.22 per hour.

98. Following AgileThought's acquisition of 4th Source, AgileThought at all relevant times represented to Anovo that the engagement would continue as a fixed-fee arrangement subject only to certain fixed-fee cost increases as reflected in SOW #2 and SOW #3.

99. At no time prior to the parties' agreements in SOW #2 or SOW #3 did AgileThought revise the blended rate utilized in SOW #1 or otherwise represent that AgileThought's proposed fixed-fee cost increases set forth in SOW #2 and SOW #3 would be based on a different, let alone materially different, blended rate than that utilized in SOW #1.

100. AgileThought, however, knew at the time of the formation of the SOW #2 and SOW #3 that AgileThought was using a blended hourly rate of $81.00 per hour and had no intention of abiding by the blended hourly rate of $28.22.

101. AgileThought's material omissions and misrepresentations were intended to, and in fact did, induce Anovo to enter into SOW #2 and SOW #3

102. Anovo suffered damages as a result of its reliance on AgileThought's material omissions and misrepresentations and is entitled to recover such damages.

103. Alternatively, Anovo is entitled to rescind SOW #2 and SOW #3 based on AgileThought's fraudulent inducement.

## COUNT VI – CONVERSION

104. Anovo realleges and incorporates the foregoing paragraphs as if fully set forth herein.

105. The MSA defines "Work Product" as "[a]ll software, hardware, programs, source code, object code, developments, designs, processes, technical information (whether in human or machine-readable form), inventions (whether or not patentable), ideas, improvements, documentation, works of authorship, mask works, company lists, and all other work product of any type or nature."

106. The Software Product, in whole or in part, is "Work Product" as defined by the MSA.

107. Under the MSA, "[a]ll Work Product designed, created, developed, conceived, and/or fixed in a tangible medium . . . for [Anovo] under a SOW shall be considered 'work made for hire,' and is the exclusive property of [Anovo]."

108. Anovo has paid over $2 million to AgileThought under the Agreements to develop the Software Product.

109. To date, Anovo has not received any of the Software Product, either in whole or in part, designed, created, developed, conceived, and/or fixed in a tangible medium by 4th Source and/or AgileThought.

110. AgileThought's wrongful, unilateral termination of the Agreements and failure to transfer the Software Product, either in whole or in part, has deprived Anovo of its property permanently or for an indefinite time.

111. Anovo has suffered damages as a result of AgileThought's permanent and/or temporary deprivation of the Software Product, either in whole or in part.

WHEREFORE, Plaintiff, AnovoRx Holdings, Inc., respectfully prays and requests that:

a) this Court enter a judgment against Defendant AgileThought, Inc., finding that it is liable to Anovo;

b) this Court rescind SOW #2 and SOW #3;

c) this Court award Anovo damages, including actual damages in amount to be determined at trial but not less than $2,500,000.00;

d) this Court award Anovo any and all other appropriate damages;

e) this Court award Anovo pre and post-judgment interest;

f) this Court award Anovo its costs and expenses in bringing this action, and

g) this Court award Anovo any and all other relief as may be just and proper under the premises.

                                  Respectfully submitted,

                                  */s/ John S. Golwen*
                                  John S. Golwen (#014324)
                                  Jonathan E. Nelson (#028029)
                                  BASS, BERRY & SIMS, PLC
                                  100 Peabody Place, Suite 1300
                                  Memphis, TN 38103
                                  Telephone: (901) 543-5900
                                  Facsimile: (615) 742-6293
                                  jgolwen@bassberry.com
                                  jenelson@bassberry.com

                                  *Counsel for Plaintiff AnovoRx Holdings, Inc.*